***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and upon reconsideration, the Full Commission affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 ***********
The undersigned finds as fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. It is stipulated that all parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter. *Page 2 
2. It is stipulated that all parties have been correctly designated and that there are no questions as to misjoinder or nonjoinder of parties.
3. The parties stipulate and agree that the following facts are fully established for the purposes of this proceeding:
 (a) An employer/employee relationship existed between Employee-Plaintiff and Employer-Defendant as of September 19, 2004 and September 23, 2005.
 (b) The dates of injury are September 19, 2004 and September 23, 2005.
 (c) Employee-Plaintiff's claims were accepted by the filing of separate Forms 60.
 (d) Employee-Plaintiff's average weekly wage is $657.36, yielding a compensation rate of $438.26.
 (e) Employee-Plaintiff has received temporary total disability benefits from June 9, 2005 to September 20, 2005. The total amount of compensation paid is $6,792.40.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 33 years old. Plaintiff graduated from high school and attended some college and technical classes at Gaston County College. He worked at MDI as an Order Selector for 2 years prior to coming to work for Defendant-Employer. Plaintiff worked for Defendant-Employer in various positions beginning in 1998. *Page 3 
2. Plaintiff was initially hired as a Material Handler, but by September 19, 2004, he had moved into a position as a Jacket Helper. This job required him to put cable onto a reel and load and unload the machines spooling cable.
3. On September 19, 2004, Plaintiff was flipping the reel upright to load and unload the machine when he felt a sharp pain in his low back. The accident report was completed by his supervisor at the time, Ralph Young, and it indicates that the injury was to his low back. Defendants accepted compensability of this September 19, 2004 injury to Plaintiff's low back pursuant to a Form 60.
4. Plaintiff initiated medical treatment for his low back on September 21, 2004, with Dr. Albert Osbahr, a family and occupational medicine specialist. Plaintiff did not describe any neck or upper back pain to Dr. Osbahr. He was placed on light duty for several months during a course of conservative treatment.
5. Plaintiff returned to work for Defendant-Employer on light duty and performed work in the guard shack and on the floor as an upender operator. The upender operator position required Plaintiff to sit in a chair, observe an area to be sure that employees were clear, and push a button.
6. Plaintiff continued to receive conservative treatment from Dr. Osbahr until an MRI revealed a broad disc protrusion at L4-5, slightly touching the thecal sac. Dr. Osbahr referred Plaintiff to Dr. Steven K. Gudeman, neurosurgeon, for treatment.
7. On October 28, 2004, Plaintiff presented to Dr. Gudeman, who recommended additional conservative treatment prior to initiating surgical intervention. This treatment consisted of physical therapy, prescription medication, and modified duty. *Page 4 
8. After Plaintiff's condition did not improve with additional conservative management, Dr. Gudeman recommended a myelogram CT which confirmed a herniated disc at L4-5. Surgical intervention with a microdisc operation at L4-5 was recommended and scheduled.
9. However, before the surgery could take place, Plaintiff presented to Dr. Gudeman on February 17, 2005, with severe neck pain. Dr. Gudeman's report indicated that Plaintiff's neck pain was triggered by movement at home.
10. Plaintiff testified at the hearing that he hurt his neck in February 2005 when he was moving himself with his arms on the sofa at his house. Plaintiff testified that he was having to move himself around with his arms as a result of his lower back injury. He also indicated that he had gone from 300 to 395 pounds due to the injury and resulting treatment, including steroid medication. Plaintiff believed the extra weight was too much for his "arms and neck to handle." He also indicated that he had to modify the way he moved around due to his low back injury.
11. Plaintiff subsequently underwent a cervical MRI which revealed a severely herniated disc at C4-5 and surgical intervention was performed on March 29, 2005. This injury and treatment delayed Plaintiff's lumbar surgery until June 15, 2005, and Plaintiff remained completely out of work in the interim.
12. Plaintiff's condition improved following the lumbar surgery and Dr. Gudeman released him to return to work without restrictions as of September 12, 2005. Dr. Gudeman issued a 19 percent impairment rating, allocating 10 percent to his lumbar spine and 9 percent to his cervical spine.
13. Plaintiff returned to his pre-injury position of Jacket Helper for Defendant-Employer on September 21, 2005, and while moving a reel over on September 23, 2005, felt *Page 5 
lower back pain again, as well as pain in his mid-back. Mr. Young was still Plaintiff's supervisor at that time. Plaintiff represented to him that he injured his lower back in the incident. Defendants accepted this September 23, 2005 injury to Plaintiff's lower back as compensable pursuant to a Form 60.
14. Following the accident on September 23, 2005, Plaintiff was transported in a company vehicle to Catawba Valley Medical Center Emergency Department for treatment. He was diagnosed with acute or chronic low back pain with stated right lower extremity radiculopathy and light duty work restrictions were issued.
15. Plaintiff returned to Dr. Osbahr for treatment on September 30, 2005, with complaints of low back pain with radiation into his right leg. Dr. Osbahr prescribed pain medication and returned Plaintiff to light duty status.
16. Plaintiff subsequently presented to Dr. Sivalingum Siva, a physician practicing with Dr. Gudeman, on October 6, 2005. Plaintiff complained of back pain radiating into his right leg and some neck pain. Dr. Siva diagnosed him with recurrent back and leg pain and ordered tests to determine whether there were any recurrent problems. Plaintiff reported some residual neck problems, but his neck was not hurting that much. "[H]is back was the problem at the time." Plaintiff was assigned light duty work restrictions.
17. Following this second injury, Plaintiff returned to work on light duty in the office doing computer work, as well as in the guard shack. After working in the guard shack for several days, on or about October 24, 2005, Plaintiff was assigned to work on the floor as an Upender Operator and in cleanup. He was instructed to go home to get his steel-toed boots. Plaintiff left to obtain the boots but did not return to the plant. Plaintiff testified that he did not return because he "broke down" due to concerns about not being able to do the job in his *Page 6 
condition. He felt impaired by the medication he was taking and did not believe he could stand on the concrete floors for 12 hours in steel-toed boots.
18. Plaintiff called in to Mr. Young, at the beginning of each shift, starting late October 2005, stating that he would not be coming in to work. Plaintiff was subsequently terminated based on Defendant-Employer's absentee and attendance policy.
19. From October to December 2005, Plaintiff continued treating his back pain with Dr. Siva. Plaintiff mentioned in December 2005 to Dr. Siva that he had been terminated and Dr. Siva continued to opine that he was capable of working light duty.
20. Plaintiff did not complain of neck pain in follow up in November and December 2005 and Dr. Siva felt that the neck pain had resolved by the time of the December 1, 2005 visit. Dr. Siva noted that Plaintiff seemed depressed in December 2005, but did not refer him to a psychiatrist for treatment. Dr. Siva found no surgical problem and referred Plaintiff for pain management.
21. Plaintiff testified at the hearing that the breakdown he experienced in October 2005 occurred because of several stressors, "pain; the way Commscope was treating me; the way they bump you around and take money from you." He also testified that the breakup with his girlfriend around this time frame was a factor as well. As a result of these feelings, Plaintiff sought treatment with a family physician, Dr. Kevin Mikus.
22. On October 26, 2005, Plaintiff presented to Dr. Mikus and reported that he was "feeling down" at that time. Dr. Mikus described several different "stressors" which were affecting Plaintiff's emotions, specifically, "work-related problems and disability," employees trying to "get him fired," "worried about losing his job," his truck was being "repossessed," "his money status," "defaulting on a second mortgage," and moving in with his mother to save *Page 7 
money. Dr. Mikus was also aware that his longstanding girlfriend of 4 or 5 years had broken up with him recently as well. Dr. Mikus opined that Plaintiff had severe to extreme depression. He started him on an anti-depressant and sleep aide and removed him from work through December 15, 2005.
23. Plaintiff subsequently treated with Dr. Debra Bolick, a psychiatrist, on November 29, 2005. Dr. Bolick noted that Plaintiff had a flat affect initially when talking about his injury, but became tearful when discussing his depression. She stated that he was "quite sad." She diagnosed major depression and prescribed medication. She also excused Plaintiff from work until follow-up in January 2006. Plaintiff was not able to continue treatment with Dr. Bolick after he was terminated by Defendant-Employer. Dr. Bolick's plan for treatment included working with Plaintiff's medications and referral for psychotherapy.
24. In December 2005, on referral from Dr. Siva, Plaintiff presented to Dr. Stanley F. Dover, a pain medicine specialist to whom he had previously been referred by Dr. Gudeman for injections. Dr. Dover diagnosed low back pain, status post lumbar surgery. Dr. Dover noted that Plaintiff had a flat affect. Because Plaintiff was not interested in further injections, Dr. Dover managed Plaintiff's pain through prescription medications and was still treating him at the time of his deposition. Dr. Dover noted that Plaintiff also complained of neck pain, though it was not his primary problem. Although he stated that he does not generally do disability evaluation, Dr. Dover opined that Plaintiff was incapacitated from anything more than sedentary work.
25. At a follow-up visit in April 2007, Dr. Dover noted that Plaintiff had lost two girlfriends recently and he was "tearful" at the visit. This was one of two occasions in which Plaintiff's affect changed from flat to tearful. Dr. Dover recommended that Plaintiff see a *Page 8 
clinical psychologist. By November 2007, Plaintiff had begun treating with a clinical psychologist, Dr. Simpson, who diagnosed him with "major depression, single episode."
26. Plaintiff returned to Dr. Gudeman regarding his low back injury in July 2007. Dr. Gudeman's treatment after July 2007 was conservative in nature until a positive discogram finding at L5-S1 on March 3, 2008. At that time, he recommended decompression surgery.
27. Plaintiff has not worked and has not received workers' compensation or unemployment benefits since October 25, 2005. Plaintiff has not sought employment. He recently applied for Social Security Disability benefits and was denied.
28. With respect to Plaintiff's neck condition, Dr. Gudeman testified in his deposition that on the Monday before his lumbar surgery was scheduled in February 2005, Plaintiff was "simply reaching and moving about and changing positions while in the couch, watching TV" and "had an excruciation [sic] neck, right arm pain with associated numbness, tingling, weakness." When asked if the shifting and changing positions that led to the neck injury were related to Plaintiff's lower back injury, Dr. Gudeman was equivocal, stating that "it seemed to me it had to play a role," but then described the connection as "plausible." In response to defense counsel's question of whether, if Plaintiff had no prior lumbar problems, moving himself on the sofa would have caused the cervical disc herniation, Dr. Gudeman responded, "I suppose so." Dr. Gudeman indicated in his testimony that Plaintiff was recommended to be out of work pending his lumbar surgery when he hurt his neck.
29. Regarding Plaintiff's depression, Dr. Gudeman testified that he did not note anything abnormal about Plaintiff's mental condition in 2004 or 2005. However, when Plaintiff returned to him on July 23, 2007, after treating with Dr. Siva for some time, Plaintiff had "totally decompensated" and exhibited an "extremely flattened affect, almost catatonic" and could *Page 9 
"barely . . . converse about what his problems were." Dr. Gudeman felt that psychological assistance was necessary at that point, in addition to treatment for Plaintiff's physical conditions. Dr. Gudeman testified that Plaintiff was disabled from work from July 23, 2007 through his last visit on March 3, 2008, due to "pain, severe depression, and chronic fatigue." Dr. Gudeman indicated that Plaintiff was unable to return to work at that time without the surgery and some psychological assistance.
30. At deposition, Dr. Siva stated that Plaintiff's depression was probably related to work and his injury and recurring pain. Dr. Siva stated that depression can be a secondary problem for patients with such injuries. Dr. Siva did not believe that Plaintiff's depression was severe enough for a referral to a psychiatrist or psychologist. However, Dr. Siva did not think Plaintiff's complaints to Dr. Mikus of depression and inability to work around the same time were inconsistent with his presentation to her. Dr. Siva would not comment on whether Plaintiff's depression was disabling.
31. In Dr. Dover's deposition, he was asked if he would defer to Dr. Gudeman's opinions regarding the relation of Plaintiff's upper, middle, and lower back pain to his work injuries. Dr. Dover declined because he was unsure of Dr. Gudeman's opinions. Dr. Dover stated that Plaintiff "had not had problems and had these accidents at work and then began having problems." Upon close review, Dr. Dover does not appear to have provided an opinion specific to Plaintiff's neck condition. He was also unaware of the incident at Plaintiff's home in February 2005 that triggered his neck pain.
32. With regard to Plaintiff's depression, Dr. Dover testified that Plaintiff had become tearful in his visits due to his chronic back pain and limitations. He believed that Plaintiff was having difficulty coping with his pain condition. Although Plaintiff's loss of girlfriends may *Page 10 
have contributed to his depression, Dr. Dover was under the impression that Plaintiff's relationships failed in part because he was limited in terms of going out and being active by his chronic pain.
33. In his deposition, Dr. Mikus did not state that Plaintiff's pain was a factor in the development of his condition and he concluded in his deposition that Plaintiff's condition "possibly is related to the cultural, social workplace situations that develop surrounding the circumstances of the injury and subsequent treatment."
34. In her deposition, Dr. Bolick listed the significant stressors in Plaintiff's life as his back surgery, neck surgery, chronic pain, loss of a relationship, and financial distress. In her opinion, these factors were all co-contributors to his depressive illness.
35. The greater weight of the evidence indicates that Plaintiff's cervical spine injury in February 2005 and any ongoing cervical issues are not related to Plaintiff's compensable lower back injuries.
36. The greater weight of the evidence establishes that Plaintiff's depression is related to and is, in part, a result of his compensable lower back injuries. Only Dr. Mikus opined that Plaintiff's depression was not related to his work injuries, but rather to his workplace situation. In particular, Dr. Bolick, the only testifying mental health specialist, opined that Plaintiff's injury-related chronic pain was a significant contributor to his depression.
37. Based on the recommendations and opinions of Dr. Mikus, Dr. Bolick, and Dr. Gudeman and supporting observations by Dr. Siva and Dr. Dover, the evidence establishes that Plaintiff is disabled by his injury-related depression. Plaintiff has been disabled by his depression since his "breakdown" on his last day of work on October 24, 2005, which was soon followed by Dr. Mikus taking him out of work on October 26, 2005. *Page 11 
 ***********
Based upon the Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On September 19, 2004, Plaintiff sustained a compensable injury to his low back arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. On September 23, 2005, Plaintiff sustained a compensable re-injury to his lower back arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
3. As a result of these compensable injuries, Plaintiff has chronic pain, which has been a significant contributing factor to his depression. Therefore, his depression is also compensable.Bowen v. ABF Freight Systems, Inc.,179 N.C. App. 323, 633 S.E.2d 854 (2006); Haponski v.Constructor's, Inc., 87 N.C. App. 95, 360 S.E.2d 109 (1987).
4. The greater weight of the evidence indicates that Plaintiff's cervical spine problems are not causally related to his compensable low back injuries on September 19, 2004 and September 23, 2005. N.C. Gen. Stat. § 97-2(6).
5. The greater weight of the evidence indicates that Plaintiff has been disabled by his depression since October 24, 2005. Therefore, Plaintiff is entitled to receive temporary total disability compensation as of that date and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-2(9). Based on this conclusion, it is unnecessary to address whether Plaintiff constructively refused suitable employment with Defendant-Employer. *Page 12 
6. Plaintiff is entitled to medical treatment for his lower back injuries and depression which would reasonably effect a cure, give relief, or lessen his disability. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $533.36 per week for the period from October 26, 2005, through the present and continuing. Accrued compensation shall be paid to Plaintiff in a lump sum.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by Plaintiff as the result of his September 19, 2004 and September 23, 2005 injuries for treatment that provides relief, effects a cure, or lessens his disability, including expenses associated with treatment for his depression.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for Plaintiff. This fee shall be deducted from the accrued compensation due Plaintiff and paid directly to counsel for Plaintiff in a lump sum, with counsel for Plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs.
This the ___ day of March 2010.
 S/___________________ PAMELA T. YOUNG CHAIR *Page 13 
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1